NATIONAL FERTILIZER CO. *v.* LAMBERT *et al.*

(*Circuit Court, N. D. California.* December 7, 1891.)

1. CONSTITUTIONAL LAW—POLICE POWER—MONOPOLIES.

The ordinance of San Francisco granting to Charles Alpers the exclusive right to remove from the city limits all such dead animals, not slain for human food, as shall not be removed by the owner in person, or by his immediate servant or employe, within 12 hours after the death thereof, and requiring the owner, if not intending to so remove it himself, to immediately deposit a notice of the death in a box provided for that purpose by Alpers, is a valid exercise of the police power, and is not open to objection as creating a monopoly, or as depriving persons of their property without due process of law.

2. SAME.

Although the ordinance in terms gives the right to remove the carcasses "from the city limits," the fact that the licensee's factory, where the bodies are converted into commercial products, is situated in "Butchertown," within the city limits, is no objection to his exclusive right, as the purpose of the ordinance is substantially effected by disposing of the carcasses so as to prevent the creation of a nuisance.

3. SAME.

The licensee's right, as against every person but the owner, attaches immediately on the death of the animal, and is not postponed until the expiration of the 12 hours.

In Equity. Suit by the National Fertilizer Company to restrain W. P. Lambert and others from interfering with its rights under the "dead animal contract" of San Francisco. Injunction granted.

*Langhorne & Miller*, for complainant.

*R. C. Harrison* and *Lloyd & Wood*, for respondents.

HAWLEY, J., (*orally.*) This is a suit in equity to restrain respondents from infringing upon the exclusive rights and privileges of complainant under what is commonly known and designated as the "dead animal contract." The board of supervisors of the city and county of San Francisco, on December 11, 1882, passed the following resolution, viz.:

"Resolved, that for the period of twenty years from and after the 1st day of December, A. D. 1882, Charles Alpers, the assignee of Gustav Wetzlar of the contract with the city and county for the removal of dead animals from the city limits, bearing date May 29, 1866, or the assigns of said Alpers, shall have and enjoy the exclusive right and privilege of removing from the city limits all carcasses of such dead animals, not slain for human food, as shall not be removed and so disposed of as not in any manner to become a nuisance, within twelve hours next after the death of the same, by the owner thereof, or the person in whose possession such animal may be at the time of its death, or by the immediate servant or employe of such owner or person.

"Resolved, that for the purposes hereof the said Charles Alpers or his assigns shall keep up and maintain order boxes for the receipt of notices for the removal of such carcasses of dead animals in conspicuous places at the new city hall and health office, in said city and county; and the same shall be labeled, 'Orders for the Removal of Dead Animals.'

"Resolved, that the owners of any animal that shall die within the city limits within the said period of twenty years from and after the 1st day of December, A. D. 1882, save such as shall be killed for human food, or the person in whose possession such animal shall be at the time of its death, shall, immediately upon such death, notify the said Charles Alpers or his as-

signs of such death, and of the place where such carcass may be found, by depositing written notice thereof in one of the boxes above provided for, or by personal notification, unless such owner or person shall himself, or by his immediate servant or employe, and not otherwise, remove and dispose of the same, in such manner as not to become a nuisance, within twelve hours next after such death shall occur: provided, that the term 'servant or employe,' herein employed, shall in no manner be construed so as to include a contractor or other person not actually employed by and under the direct supervision and control of such owner or person.

"Resolved, that said Charles Alpers or his assigns shall receive no compensation whatever from the city and county for any such removals; but said city and county, in full consideration thereof, shall protect the said Charles Alpers and his assigns in the exclusive rights and privileges to make all such removals by all such orders and resolutions as may be lawfully made in that behalf.

"Resolved, that it shall be the duty of all health and police officers of said city and county, upon being informed of any such death, to immediately notify said Charles Alpers or his assigns personally, or by depositing a notice thereof, as herein provided."

And on December 26, 1882, in pursuance of said resolution, enacted the following order, viz.:

"Concerning the removal of dead animals from the city limits.

"Whereas, on the 11th day of December, A. D. 1882, the board of supervisors of the city and county of San Francisco passed resolution No. 16,013½. (New Series,) giving to Charles Alpers and his assigns the exclusive privilege of removing the carcasses of dead animals from the city limits, so that the same may not become a nuisance, for the period of twenty years from and after the 1st day of December, A. D. 1882, which resolution was duly approved on the 15th day of December, 1882: Now, therefore, the people of the city and county of San Francisco do ordain as follows:

"Section 1. Whenever any horse, ass, or mule, swine, sheep, goat, or cattle of any kind, save such as shall be killed for human food, shall die within the limits of the city and county of San Francisco, the owner thereof, in person or by his immediate servant or employe, and not otherwise, or the person in whose possession such animal shall be at the time of its death, shall remove and dispose of the same, in such manner as not to become a nuisance, within twelve hours next after such death shall occur, or immediately upon such death shall notify said Charles Alpers or his assigns, in person, thereof, and the place where such carcasses may be found, or by depositing a written notice thereof in one of the boxes labeled, 'Orders for the Removal of Dead Animals,' set up by the said Charles Alpers or his assigns at the new city hall or health office, in said city and county. Any person who shall violate any of the provisions of this section shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than ten dollars, nor more than fifty dollars.

"Sec. 2. Any person other than the said Charles Alpers or his assigns, or the owner, by himself or his immediate servant or employe, or the person having possession of any animal mentioned in the preceding section at the time of its death, who shall remove or dispose of the carcass of such animal, unless the said Alpers or his assigns shall fail to do so within twenty-four hours after notice thereof, as hereinbefore provided, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than ten dollars nor more than fifty dollars: provided, the term 'servant or employe,' whenever herein expressed, shall in no manner be construed

so as to include a contractor or other person not actually employed by and under the direct supervision, control, and direction of such owner or person.

"Sec. 3. Any person who shall obstruct, hinder, or in any manner interfere with the said Charles Alpers or his assigns in the removal or disposition of the carcass of any animal mentioned in section 1 of this order, by intercepting any notice herein mentioned, or by putting up or maintaining any box for the receipt of any notices for the removal of such carcasses, or by soliciting in person, by agent, or by advertising, or by maintaining any stands or trucks or drays used for the purpose of such removal, or otherwise, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than twenty dollars, nor more than one hundred dollars, or by imprisonment in the county jail not more than three months, or by both fine and imprisonment.

"Sec. 4. It shall be the duty of the keeper of the public pounds of said city and county to notify Alpers or his assigns to remove the carcassses of all dead animals destroyed by him, and of all the health and police officers of said city and county to give the notices provided for in section 1 hereof, whenever the death of any animal therein named shall come to their knowledge.

"Sec. 5. The said Charles Alpers or his assigns shall give to the people of the city and county of San Francisco a good and sufficient bond, in the sum of one thousand dollars, with two or more sufficient securities, for the due and faithful performance by him or them, without compensation from or expense to said city and county, of all the conditions imposed upon him or them by this order, and the resolution abovesaid.

"Sec. 6. This order shall take effect immediately upon its approval.

"In Board of Supervisors, San Francisco, December 26, 1882. After having been published for five successive days, according to law, taken up and passed by the following vote."

Alpers accepted the said resolution and order, executed the bond, and entered upon the performance of the duties required of him, and thereby acquired all the rights and privileges granted thereunder. The rights of Alpers have been assigned to complainant. A provisional injunction was issued against all the respondents. The respondents, other than Lambert, made default, and a decree has been regularly entered against them. The case is now presented, upon final hearing, upon its merits, as against the respondent Lambert. As thus presented, it involves the question of the constitutionality of the resolution and ordinance, and a construction of the contract created by their passage and acceptance. It may be admitted, as claimed by respondents' counsel, that there are several features of the contract that do not commend themselves to public favor; but they are such as relate to the wisdom, policy, or expediency of making such contracts. The court, however, has only to deal with the question as to the power of the board of supervisors to pass the resolution and ordinance, and determine whether they are valid, and, if valid, to construe their provisions. The constitutionality of the contract is assailed upon three grounds: (1) That said contract attempts to create a monopoly, and is for that reason in violation of section 21 of article 1 of the constitution of the state of California; (2) that the contract attempts to deprive persons of their property without due process of law; (3) that the contract is in restraint of trade.

It is the duty of every government, whether state or municipal, to pass laws or ordinances for preserving the public health, protecting the good order and peace of society, and providing for the abatement of nuisances. Such laws, if they contain nothing more than the necessary restrictions and limitations for the accomplishment of such purposes, are not unconstitutional on the ground that they deprive persons of their property without due process of law. Quarantine regulations, for instance, materially interfere with the free and unobstructed use of private property, and for the time being restrain, to a certain extent, the liberty of individuals. Yet the health, safety, and welfare of the community often demand their enforcement; and such laws have always been upheld as necessary police regulations. Several other instances might be cited where laws of a similar character are sustained; but the authorities are too numerous, and the general principles of law too well settled, to require any extended reference or review. No person has an inalienable right to produce disease, or trade in that which is noxious; and in every community, large or small, some minor rights of individuals must be surrendered for the benefit, protection, health, and general good of all. In *Alpers* v. *City and County of San Francisco*, 32 Fed. Rep. 503, the constitutionality of this "dead animal contract" was involved; and it was sustained and declared valid as a legitimate exercise of the police power of the state. FIELD, J., in delivering the opinion of the court, said:

"There is no doubt that the contract between the plaintiff and the city and county of San Francisco is one within the competency of the municipality to make. It is within the power of all such bodies to provide for the health of their inhabitants by causing the removal from their limits of all dead animals not slain for human food, which otherwise would soon decay, and, by corrupting the air, engender disease. And provisions for such removal may be made by contract, as well as the performance of any other duty touching the health and comfort of the city; its authorities always preserving such control over the matter as to secure an observance of proper sanitary regulations. In addition to this general power, the constitution of the state of California which was in force when the contract with the plaintiff was renewed, declares that 'any county, city, or township may make and enforce within its limits all such local police, sanitary, and other regulations as are not in conflict with general laws.' Article 11, § 11. And the consolidation act of 1863, still in force, provides that the board of supervisors shall have power 'to authorize the summary abatement of nuisances; to make all regulations which may be necessary or expedient for the preservation of the public health, and the prevention of contagious diseases; to provide by regulation for the prevention and summary removal of all nuisances and obstructions in the streets, alleys, highways, and public grounds of said city and county; and to prevent the running at large of dogs, and to authorize the destruction of the same when at large, contrary to ordinance.'"

The reasoning of the court in that case, and of the supreme court of the United States in the *Slaughter-House Cases*, 16 Wall. 86, and of the state courts in *Weible* v. *Struss*, (Ky.) 1 S. W. Rep. 606; *State* v. *Fisher*, 52 Mo. 177; and many other cases cited in the complainant's brief,—is decisive of the question under review. The contract does not deprive

the owners of their property, as was the case of *Rendering Co.* v. *Behr*, 77 Mo. 91. It simply provides for the removal of all dead animals, not slain for human food, from within the city limits, in such manner as not to become nuisances. All the provisions of the resolution and ordinance are framed for the sole purpose of carrying out this object. The contract is not, in my opinion, subject to any of the constitutional objections urged against it.

What is the proper construction of the contract? Respondent contends that the only exclusive right granted to Alpers is—*First*, to remove the carcasses beyond or outside of the city limits; and, *second*, that such exclusive right does not attach until the expiration of 12 hours after the death of any animal, and that any person is authorized to make removals within said 12 hours. It appears from the evidence that complainant has been engaged in removing the carcasses of dead animals, under the contract, from within the limits of the city and county of San Francisco, and transporting the same to Butchertown, (South San Francisco,) which is within said limits, where its factory is located, and there converting the same into useful and profitable commercial products, such as leather, oils, bones, and fertilizers. The respondent Lambert, as an independent contractor, has also been engaged in removing all carcasses which he could obtain, and conveying the same to his factory, also situated at Butchertown. He claims that all the carcasses transported by him were removed within 12 hours after the death of the animals, and that he has never removed any carcass beyond or outside of the city limits. After a careful examination of the resolution and ordinance in their entirety, my conclusion is that the object, intent, and purpose of the contract was, as before stated, to prevent and abate nuisances within the limits of the city and county of San Francisco; that this could be done, under the contract, by the removal and disposal of the carcasses of all dead animals at a point within the city limits, as well as if they were conveyed to points outside of and beyond the city limits, providing such disposition could be made without committing a nuisance; the essential essence of the contract being that all the carcasses should be removed and disposed of in such a manner as would avoid and prevent the commission of any nuisance. Respondents' first contention cannot, therefore, be sustained. The second point is equally untenable. The resolution permits the owner, within 12 hours after the death of any animal, to remove and dispose of the carcass. It also provides that such removal may be made by any person in whose possession the animal may be at the time of its death, within 12 hours thereafter. The removal may also be made within that time by the immediate servant or employe of such owner or person; but it is expressly provided that the term "servant or employe" "shall in no manner be construed so as to include a contractor or other person not actually employed by, and under the direction, supervision, and control of, such owner or person." If the owner does not desire to remove the carcass himself, he must, under other provisions, give Alpers notice immediately after the death of the animal; and

Alpers' right to remove such carcasses attaches in all such cases within 12 hours after the death of the animal. All removals must be made either by the owner or person in whose possession the animal is at the time of its death, or by their immediate servants and employes, or by Alpers. If made by the owner or person in possession, it must be done within 12 hours after death. In no event can such removals be made by independent contractors. Complainant is entitled to a decree enjoining respondent Lambert from infringing upon its exclusive rights under the contract.